In this case, there are two principal issues, the claim construction issue and the adequacy of the inequitable conduct pleading. I'll turn first to claim construction. The first thing I want to emphasize to the Court is that the claims in issue here are extremely simple and straightforward. They simply say a soil nutrient composition that's made up of ammonium sulfate, elemental sulfur and a micronutrient, and importantly, wherein the amount of ammonium sulfate present is greater than the amount of elemental sulfur. I don't think we need all that. The whole issue is micronutrient, right? Is it high concentration or not? No, it's not limited. The claims are clear. I point your attention that the claim does not say anything about high concentration. But I guess the lower court held there was a disclaimer of claim scope, that there otherwise claim language, the claim shouldn't be given its claim language. Why do you turn directly to that? All right. I would suggest to you that it's not an omission. The Court read in entirely through limitations that had no basis in the claim, and we couldn't have even put in, if we wanted to, the limitations that the Court has added to the claim. So... What led the Court astray here? Was it the convoluted prosecution history with respect to the parent? I mean, they're, you know... That, and I think particularly it was the theory adopted by Mosaic of disavowal, saying that why there was the disavowal is because the preempts in the claim of the parent are the same as the preamble in the claim of the child case. And so you have a situation where the Court simply did not focus on the limitations, the different substantive limitations between the claims and the different arguments made. He understood or concluded that because the preambles of the claims were the same, then and thereupon, everything that was said in the parent case had to be carried over into the child case. That's the fundamental wrong, fundamental error here in my judgment. All right? Now... And the Court asked about the high business. That arose from two incidents in the file histories. First is that one of the, there were two sets of claims in the parent case. One had to do with the amount, the relative amounts of ammonium sulfate to elemental sulfur. The other had to do with, there was another set of claims had, the limitation was that the micronutrient was the preponderant ingredient of the composition. All right? So since that argument was made as to those claims, that was carried forward into the child case. Secondly, in an introductory statement, paragraph if you will, in the child application, and let me, before I say that, there were four sets of claims submitted in the child application. There was a claim set that had, and there were different novelty for each set of claims. One of them said 4.6 to 74 percent micronutrient. Another had 0.02 to 18 boron. There was one having to do with the amount of sulfur. Then there was a fourth class, it was actually the first class, claims 47 through 62 that had no recitation, no argument whatsoever about high. Now as an introductory statement, as a lead in to all of this, a statement was made that the invention is concerned. With regard to 47 to 62, didn't the patentee distinguish bextant on the sulfate to sulfur ratio? Yes, ma'am. But not at all in high concentration. Not at all. There's not a single word of argument about high concentration in the argument. They were separately argued. You don't think the general statement on page 9, even though it says the present invention is concerned with high concentration, should be interpreted in light of the rest of the clarity of the. Absolutely. Absolutely, Your Honor. Even though it says the present invention, you don't want it to apply to all claims. Well it clearly doesn't apply. I mean, I would point the Court's attention to the Rambis case and the Invitek case, which both is virtually a replay of this case, where even if you grant Mosaic's argument that this was simply a facially inaccurate remark, at worst. And no one reading the arguments with respect to 47 to 62 could possibly come away with any belief that there was anything having to do with high concentration. And certainly, the claims have been amended by the Court below to say a specific range of at least 5%, at least about 5%. There's nothing like that in the arguments made in support of claims 47 to 62. There's simply nothing. So we believe that there's simply no basis for doing this. And you asked about why the Court was led astray. Because of this argument, which we consider to be ridiculous. That because the claims in the parent and the claims in the child have the same preambles. See, our view is that for there to be a disavowal between parent and child applications, there must be the same limitation that gave rise to argument. The preamble of those claims gave rise to no argument whatsoever. They don't distinguish anything. Excuse your argument. Am I understanding it right that with regard to the parent, when they talked about the micronutrients having a high concentration, that they then added expressly a limitation into each of the claims in the parent that said that explicitly? Yes, ma'am. And so those remarks go exclusively to the added limitation. And the new claims don't have the added limitation, so the remarks don't apply. That's your argument? That's exactly right. One of them, but that's certainly a principle argument, yes. And so we do not believe that there's any possible way that the court's opinion below, order below, should be sustained. Because this is not a situation where you have a slight shading of a word or something. This is a wholesale importation into the claims of limitations that were simply not there. I think the court's order below is very brief. And it was able, in three paragraphs and one and a half pages in length, to violate virtually every principle of claim construction this court has ever enunciated. Well, that's quite an accomplishment. I find it remarkable. Well, you might end up back there. You might want to choose your words carefully. Yeah, if you get what you want, you're going back to the same judge. You think his clerks don't read his transcript? Well, Your Honor, I have to advocate. For example, one of the things that does this limitation about the amount, it violates the rule that you don't interpret a claim to exclude preferred embodiments. Our Table 1 had broad and preferred ranges, and they're all well below 5%, the minimums in those ranges. So therefore, a huge swath of the actually recited products are being eliminated by this claim construction. And then, of course, they also had the error of interpreting or adding in things from the examples. When the patent on its face says, we're giving you these examples for illustrative purposes, but nothing there is to be deemed a limitation on the invention. So there's just fundamental error throughout. If you don't mind, would you mind if I moved you to your inequitable context? That's just where I was heading. Thank you. Good. So why couldn't the failure, just out of curiosity, how many articles did Mr. Murphy co-author with the inventor? I don't know. It's more than one, because you both talk about articles, plural. So it must be some number. I don't think there were any refereed articles. I think they were just things that they put out to the trade. And I think his resume was limited to refereed articles. So you think the 149 articles that he listed on his resume were all limited to refereed articles? I believe that to be the case, not to be wrong. Did he include any trade-type publications along the lines of what these things were? Your Honor, I must say, I did not read the record in that context. I don't know. You don't know. So that's at least a question of fact there. So I'm not sure that we could conclude the district court abused his discretion by letting this go forward on the basis of that argument, because there's some distinction between refereed articles and non-refereed articles. So if that's the case, how did the district court abuse his discretion? You think there's just no evidence alleged of intent on the pleading? Well, there's several things. As to the Murphy issue, the omission of that relationship, there are conclusory allegations in the counterclaim. But there are no well-pleaded facts that establish the predicates for that. For example, knowledge. There is absolutely no allegation, not even a bare allegation, that the parties in question had sufficient knowledge. In other words, suppose that, I mean, he certainly alleges that they knew that these references were left off of the resume. I mean, if he cherry-picked, and he has 149 articles on there. I mean, if he cherry-picked the only three things he's ever written were left off, and they happen to be written with the inventor, why isn't that awfully... Yeah, but there's no facts to that effect. There are no well-pleaded facts to that at all. Well, the facts are that he left off all the articles that he co-authored with the inventor, and that there is more than one, and that he listed 149 articles. How many more does this man have beyond that? You know, I mean, it sounds like he may have listed everything that he ever had, except for the ones with this inventor. But, you know, that seems to me to give rise to an inference of intent. But there are no facts, pleaded facts, to that effect, none whatsoever. Well, I thought they pledged that he left off the articles that he co-authored. All right. And they pledged that he listed all the other articles, and you can count them, there are 149. So why isn't that an adequate pleading? I mean, we're just talking about meeting a pleading statute. No, I understand that. But, well, all right, concede that. But there's still no pleadings that counsel was aware of the relationship. Counsel doesn't have to be, only the inventor, right? Well, he's not an inventor. Well, but the inventor certainly knew he had co-authored. But there's no allegation the inventor was in any way involved in the preparation of the affidavit, or the declaration. No pleading whatsoever to that effect. So, I mean, the point is, the tactic adopted in this counterclaim is somebody must be guilty. But isn't that, I mean, it's awfully suspicious that these things were left off. I mean, so suspicious in light of the volume of articles that were included, that, I mean, isn't that enough from a pleading standard to imply knowledge? I mean, the inventor certainly would have been aware that he co-authored things, that if he'd even so much as glanced at this thing, and, you know. But there's no evidence, no pleaded facts that he ever looked at. None. Zero. They had a full opportunity to gather all the facts. My goodness, shouldn't the inventor, I mean, shouldn't the inventor be looking at these things during prosecution? This is something submitted by someone who he's got a relationship with, who he was a co-author with. Wouldn't he have looked at this? I mean, it seems like a reasonable assumption. Well, Your Honor, I mean, people can be very, very busy doing other things, and they leave it to their lawyers. I mean, but the. But it well could go the other way. And that's why, I mean, we're just at a pleading stage. I mean, that's what I'm saying. That's right. And but our position is, Your Honor, you must have sufficient well-pleaded facts, not conclusions, not allegations, not broad-brush stuff. Well, if I'm all in to this knowledge idea that no one would ever be able to prove inequitable conduct unless they had some smoking gun that established that the inventor or the attorney had explicit knowledge. So how am I going to. I would disagree with that characterization, because they could very easily say, ask Sanders, did you ever look at this? Did you ever look at this? There was no such question ever asked. It was just assumed. Well, this is the pleading. This is, oh, you're saying during discovery. Yeah. I mean, and they were granted, asked for and were granted an extension of time to gather facts. So they don't even take the elementary step of finding out whether the inventor ever looked at this. They don't take the elementary step of finding out who all knew what. They just make the assumption that somebody's guilty. And that's improper under Extrogen, and under Iqbal, and under Twombly. Now. In your rebuttal time, do you want to save it, or you're free to continue if you'd like? I'll continue. Let's finish it. Another issue, Your Honor, is the fact that the magistrate below clearly indicated that he was deciding this on notice pleading principles. That enough should be enough to get at least a remand. He said, this is notice pleading. Now, that absolutely does away with Rule 9b and all of the case law in this issue. And then, as to this business of the misrepresentations, this is their whole theory, is that there were misrepresentations about the very prior art cited by the examiner and considered by the examiner. And we think that is an improper way to try to gin up a counterclaim for inequitable conduct. In using that, you can always get an inequitable conduct claim in. You simply say, I've got a different opinion about what the prior art teaches, what the prior art says. But then, you knew, you were aware of the content. Who can argue that? And then, it's just a general affirmant of Siena. So any defendant can always comb through a prior art reference considered by the examiner, dredge up something that in his litigation-inspired opinion is at odds with what was argued, say that that was an error or an intentional misrepresentation. Then, you say, well, you knew about the content, and I only had to make a general affirmant of intent. So therefore, any defendant can, at any time, put the patentee through the wringer of an inequitable conduct. Thank you. Thank you. Mr. Lancaster. May it please the court, counsel, I'd like to start with Judge Moore's first question, which directed our attention to the 5% limitation. And I want to start there, and if it were up to me, I would end there, because the court need not reach any of the other issues in this appeal. The most straightforward route to affirmance is the 5% limitation on the micronutrients. And if the court affirms on that basis, as it should, it need not reach the homogenous issue. It need not reach the inequitable conduct issue. And with respect to the 5% issue, I hope to make two points in this oral argument. The first one is, there was not just a technical waiver of the argument that appellant now makes with respect to the 5%. There was a complete change of direction as to what the claim construction was. And that's a very significant thing, because what happened below was that both sides, not just sides, agreed that there had to be a floor to the micronutrient level. Both sides agreed that it was not plausible to read these claims as appellants now urged they be read, so that 1,000th of 1% of a micronutrient would infringe this claim. So the route that we took, obviously, was the 5% level, which I'll return to in a moment. But the route that the appellants took was there has to be a useful level of micronutrient. Now, we talk in our brief about how that standard doesn't make any sense. It's a subjective standard. It's understandable that the court below chose an objective standard. And we point to the efforts of the plaintiff's expert to try to defend the useful standard. It would depend on the grower. It would depend on the crop. It would depend on the soil, an utterly unworkable standard. Now, in an effort to save the argument and advance this new argument, the plaintiff argues, well, in our last moments before the district court, we changed our construction. So they submitted an expert affidavit. They submitted two briefs. They submitted a principal oral argument. And then they made this point. And exactly how they phrased it is important. They said, I'm reading from A680, the oral argument. Well, we're not attached to useful. That part's not a quote. This part is. It's just got to be enough so it does some good for the plants. Still a floor. Still not 1,000th of 1%. Got to be enough so it does some good for the plants. Now, let's take that seriously as claim construction for just a moment. Obviously, an unworkable standard. Obviously, another subjective standard. It doesn't make any sense. It is natural for the district court to have made a decision, I'm not going to go with useful. I'm not going to go with some good for the plants. But I accept both parties' argument that it is not plausible that 1,000th of 1% infringes. Let me mention, while I'm discussing waiver, one other issue that's a brand new one. This one was briefed to the contrary to the district court, argued orally to the contrary to the district court, argued in the principal brief to this court to the contrary. In the reply brief, and now in oral argument, appellants say this language we're focused on is preamble language. That never came up before. The parties and their experts submitted to the district court this language because we think it needs construction. And at the reply brief level, it's become preamble language. And when you look at the claim language, soil nutrient composition, blah, blah, blah, and then later in the text of the claims, a reference to said composition, that it's merely a preamble that can be ignored, doesn't make sense. But what we're talking about is a composition with a minimum level of micronutrients. Now, let me turn, if I could, to the choice the district court did make, the 5%. As Judge Moore has already observed, the starting point for that is, although there's the same language in the parent, this court doesn't have to deal with what happened in the parent application. Because as Judge Moore was pointing out, there's an entire paragraph introducing the child application, the patent in suit, that refers to the high concentration micronutrient composition. Now, the appellants say, typographical error, slip of the pen. We're talking about an entire paragraph. I don't think that's a fair characterization of their argument at all. I don't think they suggested it was a typographical error or slip of the pen. Why did they say that? What did they say is a typographical error? They say that it's an attorney mistake, is what they say. And they cite some cases where this court found that there were some attorney mistakes. So I think the phrase typographical error, that is my gloss on it. But attorney error is definitely in their brief. And I don't have the page right here in front of me. But I'm certain that it's there. It was improper to, if you're going to interpret this sentence as a statement that every single claim within this patent has to be limited to high concentration, then it was an erroneous sentence to write that way. Because it says the president mentioned. I'll accept that. But you go through and you read the entire rest of this remark section. I mean, that's a very introductory sentence. And the rest of it is about taking groups of claims and distinguishing them on different bases from Vexton. And I have to say, I see nothing in claims 47 to 62 to suggest that they were distinguished on the basis of having a high concentration, but rather that they were distinguished on the ratio of sulfur to sulfate, which was also in that same introductory paragraph. That's right. But that introductory paragraph confirms rather than detracts from the point that the description of the present invention, which this court has held on a number of occasions, is a language that is used to define an entire invention, does relate to the entire invention. Because at three subsequent points in that paragraph, there's description of in one aspect of the invention, in another aspect of the invention, in a still further aspect of the invention. The drafter knew how to distinguish between a statement that would refer to the entire invention. Here's your problem. Disclaimer must be clear and unmistakable. And if this paragraph were the only thing in the remarks section, I think you'd have me. But when you go through the entire rest of this, it quite clearly lays out the different things, the different ways in which they are limiting the different claims in light of Bexton. It sets out two alternative ways that each group of claims could be narrowed. But not every claim has to be narrowed according to both. And it's quite clear that 47 to 62 is distinguished on the sulfur sulfate. And even if I agreed with you about the present invention language, it's not enough to be clear and unmistakable, which is what your burden is. And that's a really high burden. That's our burden, Your Honor. What is striking about these remarks is that there are, as the court observes, four sets in every single set in various ways, some related to the micronutrient level, some not, as the court observed. Bexton is distinguished. And that is a continuation of exactly what was distinguished was Bexton because, as observed in the parent, Bexton was 5%. Well, clearly, in the parent, Bexton was distinguished on the basis of a high concentration. And they actually took and wrote in on every one of the independent claims the high concentration limitation. I don't think opposing counsel has argued with you, at least not before us, that the parent didn't incorporate those limitations into all of the claims. Unless I'm wrong, I don't remember him making that argument. So I think the real question is, does a limitation incorporated to parents necessarily come down into a claim even when there is an indication that it's not intended to? Well, we would, of course, quarrel with the notion that there's any indication that it wasn't intended to. In fact, to the contrary, as I say, Bexton, in various ways, is distinguished repeatedly. One of the principles that we've In various ways, that's the whole problem, right? If the only way in which Bexton was distinguished was high concentration, you'd win. But it's not. It's various ways with regard to various sets of claims. One of the points that we rely on, Your Honor, is the established doctrine that if a patentee says, my invention is different for reasons A, B, and C, it is bound by all three reasons. It's not entitled to say, C was the last reason I gave. That's the only one that matters. And the way this But I guess the problem is, in terms of the clear and unmistakable thing, if the patentee said claim one is distinguished for A, claim two is distinguished for B, and claim three is distinguished for C, you can't then say that all the claims are limited by all three, A, B, and C. And that's the argument. That's the crux of the difference between the two of you. Well, we would go back to the language in both the parent and the child that is the same. The claim language that we're talking about, in terms of the introduction, is the same. I grant, of course, that in the parent, the claims were amended to add higher levels of micronutrient. But how the patentee described that amendment is important here. Because in the parent file, the patentee  history for the parent. The examiner brought to attention the Bexton patent. I'm looking at the first full paragraph. Bexton makes clear that he refers only to a minor amount of trace element, less than 5% by weight. However, Bexton in no way suggests a high concentration product is presently claimed. And then here's the point that I want to emphasize. During the interview, and to further distinguish Bexton, and then he goes on to talk about adding the additional micronutrient levels. So he doesn't say, you don't have to pay attention to what we were arguing about the initial claims, which didn't have any explicit micronutrient floor. All you have to pay attention to is, well, we added some micronutrient. What he says is, I've got two arguments here. One, doesn't apply to the present invention at all. But two, we changed our claims to move it farther away from Bexton anyway. And then what he does in the child application was take the same point and spin it out in various different ways. Now, one of the things that's telling in the child is the consciousness that the written description presents significant problems for the patentee, even in a different set of claims, the claims with the floor of 4.62. And as the court may have noticed, in the arguments to the examiner, the patentee worked very hard to show how support for that low range, 4.62, no argument for any range below that, was supported by the specification. The patentee says, support for these ranges can be found in the specification I'm reading from A150. And then what he does is go on to contradict the argument here that because there are individual micronutrient percentages that fall below 5%, therefore, that's somehow inconsistent with the claim construction. What the patentee was working very hard to tell the patent office and to persuade the patent office of is you add up multiple different micronutrients to come to a level, and the lowest level that the patentee could find any support for in the specification was this 4.62% level. And that's part of what is appropriate for this court to rely on when it's conducting its claim construction. In the different sets of claims in which Bexton is distinguished, there are a number of points granted, Your Honor, with respect to slightly different language, where the patentee again emphasizes how distinct Bexton is with its 5% micronutrient level on the micronutrient count. He says, for instance, Bexton, and again, granted, Your Honor, these are different sets of claims. Bexton is to be contrasted with the present claims where the minimum amount of micronutrient as an elemental mental micronutrient is 4.62%. Another set of claims. Bexton is concerned with an entirely different high sulfur product, which does not provide the micronutrient uptake of the present invention. Goes on to refer to the significant quantities of micronutrients in this invention. They're referring to issued claims 29 to 44, claims that have no explicit micronutrient floor. So even as to those claims, the argument to the patent office is Bexton is different, because Bexton has such low levels of micronutrients. And so our view, Your Honor, is that that introductory paragraph is confirmed, not contradicted, by the remarks that follow. Subject to other questions of the court, I don't have anything else to say. We have your argument. Thank you. Thank you. Thank both parties. Case is submitted. Thank you. All rise.